## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| **NICOLE ELLEN TILFORD,** | § § § |
| *Plaintiff,* | § § CIV. A. NO. _____ |
| | § § |
| **v.** | § **JURY DEMANDED** § § |
| **TEGNA INC. and WFAA-TV, INC.** | § § § |
| *Defendants.* | § § |

### ORIGINAL COMPLAINT AND JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

Nicole Ellen Tilford ("Tilford") is a female, Caucasian citizen of the United States. She is currently 52 years of age. Tilford complains of violations by Defendants TEGNA Inc. and WFAA-TV, Inc. (hereinafter "Defendants" or "TEGNA") of federal laws prohibiting retaliation and age discrimination. Soon after Tilford engaged in protected activity by complaining of sex discrimination and retaliation on June 30, 2020, TEGNA began engaging in a pattern of antagonism against Tilford because of her protected activity and in further discrimination. TEGNA, through the acts and omissions of its top and local leadership showed a continuing pattern of antagonism toward Tilford from the time its President and Chief Executive Officer, Dave Lougee, its Vice President, Labor and Employment, Timothy Fair, and WFAA's Director of Sales, Ms. Gio Savorgnan, learned of Tilford's complaint of sex discrimination and retaliation on June 30, 2020 until TEGNA orchestrated Tilford's termination and fired her on July 1, 2024.

Tilford seeks redress under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621, *et seq*.

In support thereof Tilford respectfully states as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Tilford is a female citizen of Irving, Texas.   Tilford is 52 years of age.

2.      TEGNA Inc. is a publicly traded, NYSE-listed company that employed Tilford and others in Texas. The causes of action asserted below arose from and are connected to purposeful acts by TEGNA during and following Tilford's employment with TEGNA in Texas. TEGNA may be served with process through its registered agent, United Agent Group Inc., 425 W Washington Street, Suite 4, Suffolk, Virginia 23434-5320.

3.      This court has jurisdiction to hear the merits of Tilford's claims under 28 U.S.C. §§ 1331 and 1343.

4.      TEGNA Inc. is an American publicly traded broadcast, digital media and marketing services company headquartered in Tysons, Virginia. TEGNA owns or operates 64 television stations in 51 markets and holds properties in digital media.  TEGNA is the largest group owner of NBC-affiliated stations.  TEGNA Inc. holds the licence of WFAA in the Dallas-Fort Worth, Texas market.  WFAA is a television station (Channel 8) licenced to Dallas, Texas, United States, serving as the ABC affiliate for the Dallas-Fort Worth metroplex.  WFAA is the largest ABC affiliate by market size that is not owned and operated by the network through its ABC Owned Television Stations division.  Dallas is the largest media market with a "Big Four" station group (ABC, NBC, CBS, Fox).  WFAA is the only station among the Big Four in the Dallas-Fort Worth market that is not network-owned and operated.  TEGNA is a joint employer and/or an integrated enterprise.  A substantial portion of the acts and omissions underlying Tilford's claims—including the unlawful termination and the subsequent unlawful refusal to consider Tilford for hire and TEGNA's unlawful failure to hire Tilford —occurred in Dallas, Texas. Venue is proper in this

district and division under 28 U.S.C. § 1391.  TEGNA was at all times relevant to Tilford's claims and is now an "employer" within the meaning of 42 U.S.C. § 2000-e(b) and other federal statutes pertinent to this suit.

### TEGNA SUBJECTS TILFORD TO A DISCRIMINATORY DOUBLE STANDARD BASED ON GENDER AND RETALIATES AGAINST TILFORD WHEN SHE ENGAGES IN PROTECTED ACTIVITY BY OPPOSING SEX DISCRIMINATION

5.      WFAA hired Tilford as an Account Executive on May 16, 2012.  Tilford was 38 years old when TEGNA hired her.  Tilford was very successful with TEGNA until sometime after she got a new manager in October 2017, Jennifer Temple ("Temple").

6.      From the time Temple became Tilford's manager over a team of salespersons, Temple displayed an obvious preference for her male subordinates over her female subordinates.

7.      In May 2018, TEGNA hired Gio Savorgnan ("Savorgnan") as Director of Local Sales for WFAA in Dallas, Texas.  In March 2020, TEGNA issued a work-from-home order to employees including Tilford due to the COVID pandemic.  Until Savorgnan learned that Tilford complained to TEGNA's Human Resources (HR) about a double standard the company imposed on Tilford during COVID that amounted to (and was taken by HR) as a complaint of sexual harassment and hostile work environment, Savorgnan and Tilford had a good working relationship.

### TILFORD OPPOSES GENDER DISCRIMINATION

8.      On June 17, 2020, Temple and Carmen Infantas ("Infantas"), HR, met with Tilford in a Zoom call that started at 1:00 PM.   Temple and Infantas pressured Tilford to take care of her current situation.  Infantas was referring to the fact that Tilford was taking care of her 3-year-old son while working from home during the COVID pandemic. Tilford felt that Temple and Infantas were attacking her and her son and attacking her with false claims.  Tilford told them she felt a lot of anxiety and felt harassed by Temple because of all the text messages and their tone.  Infantas

took this as a complaint of sexual harassment and hostile work environment.  She attacked Tilford in response.  When Tilford said the word "harassed," Infantas exclaimed, Infantas objected to her use of the term.  Infantas asked Tilford, "harassment is a really strong word,"  that "harassment is a threat,"  and that "it's bullying."  Tilford replied, "That's how I feel."  Temple started crying.  After Tilford told Infantas and Temple that her brother-in-law was a labor attorney, and that he said they could not come after her, Infantas told Tilford they were not talking to her brother-in-law and that she found it "a little disturbing" that she said she consulted her brother-in-law.  Infantas told Tilford "Nobody's coming after you.  Nobody's building a case against you."  Infantas told Tilford, "Somebody decided, your manager decided to include HR [in the meeting] to make sure that we got the message across to you about these expectations, because your manager has had these conversations with you before."  Tilford corrected Infantas – that the "conversations" were "just last week."  Temple then told Tilford, "you're taking this so negatively, and said, "I'm so hurt right now that, from the things that you said."  Infantas then angrily ended the conversation and ended the Zoom call abruptly.

9.      Temple and/or Infantas reported Tilford's opposition to sex discrimination to Savorgnan, who reported it as a bad thing to top management at WFAA, Brad Ramsey, the General Manager of WFAA.  On June 18, 2020, literally the day after Tilford's protected activity, Savorgnan began a scolding process that ended in a threat to fire Tilford.  Savorgnan started a Zoom call meeting with Tilford at about 2:15 pm, attended by Savorgnan, Infantas (HR), Temple, and Tilford by telling Tilford she had talked to Brad Ramsey and that he was aware of the conversation the day before with Tilford.  Savorgnan made it clear in the Zoom call that TEGNA was angry about Tilford's complaint of sex discrimination and hostile work environment, criticized

Tilford for not showing "a willingness to accept . . . any accountability or a desire to actually make changes." Tilford told Savorgnan that that was not true.

10. During the June 18, 2020 Zoom call Savorgnan subjected her to, Tilford asked what she was supposed to do. Tilford told Savorgnan that she didn't want her job to be jeopardized by any means, that she was a good employee who followed the rules and explained that her husband was a medical worker, exposed to COVID every day in hospitals, and that whoever wants to step foot in her house needed to know that her husband was a medical worker exposed to COVID every day in the hospital. Tilford said that Temple told her last Wednesday in their one-on-one that she needed to contact Care.com, so she did. Temple jumped into the conversation, stating, "what I said to you was something that I have done in the past," and that "I was not saying you had to call Care.com." Tilford responded, "You said, 'Something has to be done. I will come to your house, and work from your house for three days and help you take care of your child. You're telling me I need childcare.'" During the June 18, 2020 Zoom call, Tilford accused TEGNA of having a discriminatory double standard. Tilford told Savorgnan that she felt very singled out because the whole sales team was not hitting a premion number. Tilford said she hoped "we're all under a microscope." Savorgnan immediately rejected Tilford's effort to have equal treatment. Savorgnan told Tilford, "But let's not talk about the whole sales team. This is really about you."

11. During the June 18, 2020 Zoom call, Savorgnan replied with a termination threat. After Tilford stated that she felt attacked because of her child, that she was in a tough situation, and that she was stuck, Savorgnan interrupted threateningly, saying "let me finish, looks like insubordination, insubordination." Savorgnan added, "This is not how we dialogue," and said, "This has to be done." Savorgnan referred to how Tilford mentioned harassment and HR ended the conversation. Savorgnan threatened Tilford:

Nicole, because of the way things went yesterday, we really need to get some... Just the way it ended made us go back and go, "You know what? We've gotta really make this thing more from an official conversation now." It was a conversation yesterday, but now this is, this is serious. Okay? And so what we're gonna do is we're gonna give you two weeks to show what you can do to make changes and that you've heard us. Okay? If at the end of that two weeks you're not able to function at 100% that we both agree is correct, then we will take other measures, and it could include termination.

To emphasize her threat, Savorgnan added, "And I need you to hear that." This conversation and Savorgnan's termination threat to Tilford were very traumatic to Tilford. By this time, Tilford's 3-year-old had entered the room because he heard Tilford crying and crawled up into her lap and said, "don't cry mama, don't cry mama, don't' cry mama." This is what hurt the most -- Tilford's child having to see her emotionally upset. These three TEGNA officials had attacked Tilford's character, made false claims, and blamed her child. After Savorgnan said that Tilford's job could be terminated there was a pause, no one said anything, then Tilford asked, "And how in two weeks am I supposed to prove that?" Savorgnan responded that no one was expecting her to hit her digital number, that they needed to see 60% progress, and that progress would be measured, "Through the activity that you're doing, through the engagements you're having with your team members and managers." Tilford responded, I don't know how I have more activity with Jenn. I blow her up every day with emails." Temple responded that the "gist of it" was that Tilford had to keep adding into her pipeline and making calls to fill the pipeline enough, knowing what her closing ratio was, and turning the numbers around and making some profit.

12.    Temple sent Tilford an email on June 18, 2020 at 9:14 PM, with copies to Savorgnan and Infantas, containing the termination threat. Temple's email stated:

This is to confirm the meeting we had with Carmen Infantas on June 17, 2020 and a second meeting with Gio Savorgnan and Carmen Infantas on June 18, 2020. While we appreciate the time and discussion, I have been giving you specific feedback and coaching regarding your lack of performance and engagement for the past two months. This feedback regarding call activity,

Premion and Digital account development was also described in detail in your 2019 review.

Nicole, the expectation is that you will take whatever measures are necessary to allow you to fully perform the essential functions of your role as an Account Executive.  That includes meeting your daily, weekly and monthly goals as well as being present and engaged with your team and Sales partners who can assist you in meeting those goals.  This expectation is ongoing.

Temple's email ended with this threat:

We are providing you up to two (2) weeks to make this change.  At the end of this period, on July 2nd, if you are not able to perform your duties consistently, we will be faced with the decision to terminate your employment.

Temple's email did not define how Tilford was to be measured over the next 2 weeks and pressured Tilford to resign.  Temple magnified the force of her threat by showing that copies were sent to Savorgnan and Infantas (HR).

**TILFORD ENGAGES IN FURTHER PROTECTED ACTIVITY**

13.     On June 30, 2020, with the two-week termination threat facing her swiftly after she engaged in protected activity by complaining to Temple and HR about sex discrimination and hostile work environment, Tilford attempted to file a charge with the United States Equal Opportunity Commission (the EEOC) against TEGNA for sex discrimination and retaliation.  On June 30, 2020, through her attorney, Hal Gillespie ("Gillespie"), Tilford sent her EEOC charge and "Attachment A," her 19-page statement, to the EEOC via email at dallasintake@eeoc.gov, asking the EEOC to "[p]lease file this charge today."  Tilford's sworn statement said that "[f]rom the start as our manager, Temple displayed an obvious preference for her male subordinates over her female subordinates.  Temple gave the males better treatment and displayed a pattern of worse treatment of her female subordinates."  Tilford's sworn statement provided many specific examples of this disparate treatment by Temple.  Near the end of her sworn statement, Tilford stated, "Temple, my boss, has a double standard, treating female subordinates, including myself,

far worse.  And HR is fine with this."  Tilford stated, "This double standard and the pressure on me interferes with the terms and conditions of my job, and pressuring me to quit or do something unsafe. . . . The men employed by the Station are not pressured to bring in nannies while I get this pressure."  Tilford also accused TEGNA of retaliation toward the end of her sworn statement:

> Further, after I mentioned harassment to Temple and HR (Carmen Infantas) on June 17, 2020, within a day the Station threatened to fire me in 2 weeks unless I did something the guys are not required to do and that would put me and my family's health in jeopardy that is not necessary for me to do my job and do it well - this is retaliation for the protected act of opposing sexual harassment - the double standard.

14.    Also on June 30, 2020, Tilford, through attorney Gillespie, engaged in more protected activity.  Tilford, through her attorney, Gillespie, at 2:47 PM sent three (3) things to the top officials of TEGNA and WFAA – Dave Lougee ("Lougee"), President and Chief Executive Officer of TEGNA in McLean, Virginia and Brad Ramsey, General Manager of WFAA in Dallas, Texas.  Tilford sent these two top TEGNA officials a copy of the EEOC charge itself, the 19 page "Attachment A," and a 4-page letter (the "Initial Letter") from Gillespie addressed to Lougee showing a copy to Ramsey.

15.    The Initial Letter from Gillespie to Lougee and Ramsey on behalf of Tilford told them that Gillespie was attaching Tilford's sworn charge filed on June 30, 2020 with the EEOC and the Texas Workforce Commission on Human Rights.  On the first page the Initial Letter prominently requested personal action by Lougee himself.  It stated:

> As you know sex discrimination and retaliation for raising concerns about unlawful discrimination are illegal employment practices under federal and Texas law. Ms. Tilford's claims are very serious and very important. **I respectfully ask you to personally spend the time needed to personally read Ms. Tilford's formal charge and Attachment A thereto (attached).**

The Initial Letter asked TENGA to produce fourteen (14) categories of records containing information relating the Tilford's claims and/or the defenses or potential defenses of TEGNA

within the next thirty days. The Initial Letter also specifically made this request to Lougee concerning retaliation:

> Second, **I am asking you to personally insure that TEGNA does not retaliate against Ms. Tilford in any way due to her "protected activity**," i.e. her complaints of discrimination and illegal retaliation to federal and state agencies and internally.

(Emphasis added).

16.     Without a doubt, Lougee saw the Initial Letter and read the request for him to personally spend the time needed to personally read Ms. Tilford's formal charge and Attachment A thereto (attached). The email to Lougee that attached Tilford's EEOC charge, Attachment A, and the Initial Letter was sent on June 30, 2020 at 2:47 pm. Lougee read the Initial Letter on June 30, 2020 and provided it to Timothy Fair ("Fair), TEGNA's Vice President, Labor and Employment Csl, who sent an email to Gillespie on June 30, 2020 at 5:54 PM, that stated:

> Be advised that I represent WFAA-TV and TEGNA, Inc. in this matter. Please direct all future correspondence to my attention. I will review this matter and respond on or before next Friday, July 10.

17.     Fair saw the part of the Initial Letter that politely asked TENGA to produce fourteen (14) categories of records containing information relating the Tilford's claims and/or the defenses or potential defenses of TEGNA within the next thirty days. On July 1, 2020 at 9:26 AM (in less than 30 days from the Initial Letter of June 30, 2020), Fair wrote this to Gillespie, "Please forward the legal authority, with citations, supporting your request for pre-litigation discovery as stated in you June 30 letter."

18.     Gillespie responded to Fair by email dated July 2, 2020 at 12:35 PM, providing legal authority, with citations, including:

> The request, if honored, will help both sides understand facts that may emerge in litigation if pre-suit resolution does not occur. Rule 16.3(a) of the Local Rules of the Northern District of Texas provides:

16.3 - Settlement.

a. **Settlement Negotiations.** Parties in a civil action must make good-faith efforts to settle. Settlement negotiations must begin at the earliest possible time, well in advance of any pretrial conference.

I am complying with that rule in my present settlement efforts.

In addition to the proper and commendable effort to engage in informal pre-litigation discovery for settlement purposes, my effort to uncover pertinent facts early on is relevant to a pretext analysis. An employer's failure to provide a reason for termination is evidence of pretext. *See Mock v. Bell Helicopter Textron, Inc.*, 196 Fed.Appx. 773, 774 (11th Cir. 2006)(attached). The same reasoning applies to the Station's threat to terminate Ms. Tilford.

19.     Fair responded to Gillespie by email dated July 16, 2020 at 4:05 PM.  In his email, Fair rejected Tilford's request for records containing information relating the Tilford's claims and/or the defenses or potential defenses of TEGNA.

20.     Gillespie and Fair communicated briefly about possibly resolving the discrimination and retaliation claims Tilford made in her 2020 EEOC charge and the Initial Letter. After Tilford's protected activity initiated on June 30, 2020, TEGNA did not carry through with its threat to fire Tilford in two weeks, and Tilford remained employed by TEGNA.  TEGNA did not show serious interest in reaching an agreement to resolve the claims Tilford made in her 2020 EEOC charge and the Initial Letter.  Tilford decided to let her claims "sit" unresolved, fearing further retaliation, but hoping that TEGNA would not treat her too badly and thinking that the EEOC was just being slow to investigate her claim and communicate back to her.  Tilford did not learn until sometime in April 2024 that the EEOC says it has no record of receiving the EEOC charge she sent to it for filing on June 30, 2020.

## TEGNA HARBORS ANTAGONISM TOWARD TILFORD AND DISPLAYS A PATTERN OF ANTAGONISM TOWARD TILFORD BECAUSE OF HER PROTECTED ACTIVITY

21.     Although Ramsey and Savorgnan had been angry with Tilford for her protected activity that led to the 2-week termination threat, and TEGNA top officials (including Lougee, Fair, Ramsey and Savorgnan) were angry at Tilford after learning of her protected activity on June 30, 2020 (the EEOC charge and the Initial Letter), TEGNA knew that retaliation for protected activity was illegal and was smart enough and sophisticated enough to hold its fire until it felt like firing Tilford was safe.  TEGNA decided it would fire Tilford later, after there was a "gap" between her June 30, 2020 protected activity and the termination of Tilford it wanted to accomplish.

22.     After Tilford's complaints of sex discrimination and retaliation in 2020, Tilford immediately detected a cold and hostile attitude toward her.  This was particularly true and noticeable on the part of Savorgnan, all the way from June 17, 2020 when Tilford made her complaints of illegal discrimination and June 18, 2020 when Savorgnan threatened to terminate Tilford until 2024 when Ms. Savorgnan was instrumental in trying to force Tilford to resign and then in firing Tilford.   Tilford's complaints and the fact that Tilford hired a lawyer to represent her caused TEGNA to be more careful.  Tilford could tell that TEGNA management was angry at her, but that TEGNA management was biding its time in taking steps to pull the trigger to get rid of her.   Tilford noticed that another Senior Account Executive, about her age, Gigi Tregoning ("Tregoning") who was also on Temple's team back in 2020 when she was mistreating employees did not receive unfriendly treatment from TEGNA.  Tregoning never complained and did not file an EEOC charge over the harassment she received from Temple – she kept her mouth shut and therefore did not suffer retaliation.

23.     TEGNA terminated Tilford's former manager, Temple, in July 2020. TEGNA moved Tilford to work directly for Erin Schendle ("Schendle").   Schendle did not mistreat Tilford, but Schendle left TEGNA in July 2021. On information and belief, Schendle left TEGNA due to mistreatment she received from Savorgnan.  With Savorgnan calling these shots, TEGNA whose "Plan A" was to pressure Tilford to resign (a "safe" way to get rid of Tilford) and whose "Plan B" was to terminate her when "the time was right" because of her protected activity, did not let her keep a good manager (Schendle) for long.   In November 2020, TEGNA moved Tilford from Schendle, a boss Tilford worked with well, to work for Jordan Hutchinson ("Hutchinson"), a young female (age 38) and rookie sales manager.

24.     As of July 2022, TEGNA was still very aware of the sex discrimination and retaliation claims Tilford had made against it in 2020.  In July 2022, a lawyer for TEGNA named David Schlottman, from the Jackson Walker law firm, called and emailed Gillespie about "An old case of yours:  Nicole Tilford v. TEGNA."  The official reason for Schlottman's phone call was to discuss Temple's case against TEGNA, but TEGNA was also checking on whether Tilford was still represented by counsel.  Throughout the time from July 2020 to December 2023, Savorgnan was noticeably hostile toward Tilford and did nothing overtly favorable to or for Tilford.

### DISCRIMINATORY/RETALIATORY JOB ASSIGNMENTS

25.     As of December 2023, WFAA had 3 sales teams and managers, Jordan Hutchinson and Jennifer Gray ("Gray") managed the "New Business/Enterprise" teams. New Business/Enterprise is the area of work in which Tilford's performance excelled. Craig Whitman ("Whitman") was the other manager.  Whitman managed the "Core" team.   Whitman's team is not focused on new business. In December 2023, Gray asked Savorgnan numerous times if Tilford could be moved from Jordan's team to be on Team Gray. Gray was persistent with Savorgnan that

she could handle adding two more sellers to her team (Mika Chalk-Manaster and Tilford). Realizing that the plan was to get rid of Tilford when "possible," and to find a pretext to make it look legal (and not look like illegal retaliation, which it was), Savorgnan denied the request and moved Tilford to Whitman's team in January 2024, an unfavorable assignment given Tilford's known skill set and performance record.

## AGE DISCRIMINATION AT WFAA

26.    Savorgnan's other reason (besides retaliation) for planning to get rid of Tilford (by forcing her to resign (Plan A) or by firing her (Plan B)) and to find an excuse that would make terminating Tilford appear to be legal instead of illegal age discrimination, was Savorgnan's belief that Tilford was too old for the job.  Tilford learned in February 2025, through her former manager Temple's sworn testimony in Temple's lawsuit for age discrimination against TEGNA, that Fair himself was present at Temple's deposition on May 19, 2022, when Temple testified that Savorgnan told her she would not hire a person because he was "too old for the job."  Even before Tilford learned of this "smoking gun" evidence that Savorgnan had an age discrimination agenda, Tilford realized that TEGNA's termination of her on July 1, 2024 was because of age discrimination as well as because of retaliation against her because of her protected activity.  After TEGNA, with Savorgnan taking the lead, fired Tilford on July 1, 2024, using the pretext of poor performance, Tilford alleged illegal age discrimination and retaliation in her EEOC charge dated September 27, 2024.

27.    With an agenda of getting rid of Tilford with a pretext that TEGNA would create, Savorgnan denied Tilford's request and moved Tilford to Whitman's team in retaliation for Tilford's protected activities and as an act of age discrimination.   This was part of Savorgnan's plan to get rid of Tilford on a bogus claim of poor performance.  In January 2024, TEGNA moved

Tilford to work for Whitman who Savorgnan could count on to not stand in her way of her plan to force Tilford to resign or to fire her when the time looked right.

**TEGNA IS A BAD ACTOR.  TEGNA'S VICE PRESIDENT LIED
TO THE GOVERNMENT IN RESPONSE TO TILFORD'S 2024 EEOC CHARGE**

28.     TEGNA/Savorgnan tried to force Tilford to resign, but she endured the pressure and did not resign.  TEGNA/Savorgnan then pulled the trigger on its long-term plan to get rid of Tilford by firing Tilford if Tilford did not resign when it felt it could get away with firing Tilford despite the retaliation claims TEGNA expected her to file if it discharged Tilford.

29.     TEGNA, with Savorgnan taking the lead, fired Tilford on July 1, 2024, Tilford filed a charge of illegal age discrimination and retaliation against TEGNA with the EEOC on September 27, 2024.  On information and belief, after TEGNA's President and CEO at the time of the Initial Letter, Dave Lougee, received and reviewed the Initial Letter on behalf of Tilford on June 30, 2020, Lougee took no meaningful steps to protect Tilford from retaliation for her protected activity, and Lougee did nothing to protect Tilford, but rather unleashed Fair, Ramsey, and Savorgnan to retaliate against Tilford.  TEGNA, from the time of the Initial Letter, and even before, has a pattern or practice of not protecting employees who complain of illegal discrimination at TEGNA from retaliation, and of discouraging complaints and reports of discrimination and/or retaliation by engaging in retaliation, despite being aware that such retaliation is unlawful.  On information and belief, TEGNA's Vice President, Labor and Employment, Timothy Fair, acting as an agent of TEGNA and its CEOs, helped orchestrate Tilford's termination.  TEGNA's CEO, Lougee, at the time of the Initial Letter, was replaced by a new President and CEO, Michael Steib ("Steib), whose offer letter from Howard D. Elias, Chairman of the Board of Directors of TEGNA was dated June 1, 2024.  On information and belief, Steib was aware of and condoned Tilford's termination and Fair's dishonest position statement to the EEOC.

30. Trying to evade responsibility for what it had done, TEGNA, in a Position Statement dated December 6, 2024 and signed by Fair, made numerous false, misleading and incomplete statements to the EEOC.

A. Page 3 of TEGNA's Position Statement to the Government contained false, misleading and/or incomplete information. TEGNA falsely stated, "since 2021 Complainant consistently performed worse (sic) amongst her WFAA-TV peers on digital/Premion." In fact, Charging Party Tilford's digital/Premion numbers typically ranked 9th out of 13 sellers. TEGNA had more than 13 sellers at WFAA during the relevant period. Indeed, younger peers Cato and Hare had no Premion billing for several years. Younger peer Chalk and peer Lawson had lower numbers than Tilford.

B. Page 4 of TEGNA's Position Statement to the Government contained false, misleading and/or incomplete information.

(i) TEGNA submitted a flawed and misleading chart (hereinafter "TEGNA's Chart") to the EEOC it called "% to budget Premion/digital." On the graph showing percents for some (but not all) sellers besides Tilford, TEGNA combined Premion and Digital billing. But, for Tilford, TEGNA's graph showed only Premion billing, not Tilford's combined Premion/Digital billing like the others that TEGNA "compares."

(ii) Tilford's numbers would be higher if combined like the others. Moreover, TEGNA manipulated the evidence to eliminate and fail to present the sales performance facts of many younger comparators – sales employees who worked for TEGNA at WFAA during Tilford's tenure. TEGNA's chart showed 13 sellers. But the list is actually at least 28. TEGNA had at least 28 sellers at WFAA (Dallas) during Tilford's tenure. Tilford, who TEGNA fired, was the only

WFAA/TEGNA seller who engaged in protected activity, and 75% of TEGNA's sellers were younger than Tilford.

(iii)    TEGNA's Chart incorrectly stated Tilford had 11 years of service.  Tilford had over 12 years of service.  Tilford began her employment with TEGNA on May 16, 2012.

(iv)    TEGNA falsely stated that in 2021 Tilford had 27% to annual budget Premion/digital.  She accomplished 32.7%.

(v)    TEGNA falsely stated that in 2022 Tilford had 53% to annual budget Premion/digital.  She accomplished 62.4%.

(vi)    TEGNA's statement of Hare's numbers were misleading.  Hare was a local seller, but TEGNA allowed her to work a few large National Premion accounts and be paid commission.  WFAA did not get to count this Premion revenue in its bottom line.  Hare lost this business in 2024.  Like the other sellers shown on TEGNA's Chart (other than Tilford), this number is a combined Premion/Digital number.

(vii)    TEGNA noted "Lawson is part-time."  This was misleading, omitted relevant information, and concealed Savorgnan's favorable treatment of Lawson – who never engaged in protected activity – while Tilford did.   Savorgnan showed hostility toward Tilford from the time she learned of her protected activity until Savorgnan was instrumental in firing Tilford.  Lawson lost a huge piece of digital business.  It was moved to the national team starting 2023.  Savorgnan (who was cold, hostile and antagonistic toward Tilford from the time she learned of Tilford's protected activity until she finally fired Tilford in 2024) treated similarly situated sellers who had not engaged in protected activity better than Tilford. Savorgnan agreed with Lawson that because of this large amount of business moved to the national team, Lawson would not work on Fridays.  Savorgnan gave Lawson special treatment -- no other seller had this kind of arrangement.  Lawson

had zero dollars booked for digital or Premion sales in 2 years, but since she had not engaged in protected activity that infuriated Savorgnan like Tilford's protected activity infuriated Savorgnan, Savorgnan did not play the "you don't sell enough Premion" card with Lawson.

(viii)   TEGNA's statement of Cato's numbers is misleading.   Cato was a local seller but, because Cato did not engage in protected activity that infuriated Savorgnan as Tilford had done, Savorgnan allowed Cato to sell Premion nationally for GMC, despite the fact that WFAA local does not get to include "national" Premion billing in its bottom line.   These dollars go to the national team even though Cato would get paid a commission. Cato had zero local Premion dollars booked from 2021-2023. In 2024 Cato lost this national Premion revenue and Savorgnan in June 2024 confirmed this to Tilford when she said that yes, "Karrie Cato is in a rebuilding phase with Premion."  TEGNA's Chart skewed Cato's percentages in the grid TEGNA supplied to the EEOC by combining national Premion and digital.

(ix)   TEGNA's grid misspelled "Holiday."[1]  Her name is "Holliday."  TEGNA's grid included "Huber."[2]   Nobody with that name worked for WFAA during Tilford's tenure.

(x)   TEGNA's statement to the EEOC that Charging Party's claims of success are wrong because her performance over the years has been "inconsistent" and TEGNA's statement that Tilford's "performance was rated by four different managers as falling below performance expectations" is misleading.  Savorgnan (the TEGNA retaliator who favors younger employees and employees who have not engaged in protected activity) has told managers that Account Executives need to be rated "Meets Expectations or Meets Some Expectations."  Savorgnan's instructions skew the ratings.   In 2019 Savorgnan criticized Tilford's manager, Temple, when Temple awarded Tilford an "Exceeds Expectations" rating.  Charging Party's other managers, have

---

[1] *Id.*
[2] *Id.*

**Original Complaint and Jury Demand** – **Page 17**

made the same comments to her, explaining that Savorgnan only wants to use ratings of "meets some expectations" or" meets expectations."   Thus, TEGNA cannot rely on performance evaluations to discount Ms. Tilford's good record of employment.  A strong part of Tilford's facts, indicating that the stated reasons for her termination are pretextual (not credible and unworthy of belief) is the section of her sworn statement to the EEOC entitled "I HAD GOOD, LOYAL PERFORMANCE FOR TEGNA FOR MANY YEARS."  TEGNA's Position Statement used false and misleading information to dispute these facts favorable to Tilford.

C.      Page 5 of TEGNA's Position Statement to the Government contained false, misleading and/or incomplete information.

(i)      TEGNA's Position Statement made this false and misleading statement: "Complainant's poor performance was partly due to her refusal to fully embrace digital sales." First, TEGNA's statement that Tilford had "poor performance" is false.  Charging Party's long-term performance was very good.  This "poor performance" purported non-discriminatory reason for Tilford's termination is not credible.  On January 14, 2022, Matt Ginn of TEGNA Corporate sent an email and a video clip to Tilford stating:

> Exceeding $1 Million+ in Enterprise in 2021 is a **HUGE ACCOMPLISHMENT!**
> You are 1 of 10 sellers in the entire company to achieve this!  So wanted to take a
> moment to say THANK YOU!

Tilford's excellence as a salesperson was so well-known at WFAA that her fellow salespeople at an offsite team building event, where peers and management were asked to write one word on each person's whiteboard that came to mind when they thought of that person wrote "Enterprise Queen" for Nicole Tilford.

(ii)      Tilford, despite TEGNA's false representation to the EEOC to the contrary, fully embraced digital sales.  Tilford sold numerous digital and Premion campaigns, but, as part of the

pattern of antagonism by TEGNA/Savorgnan to Tilford because of her protected activity, TEGNA took the large accounts from Tilford and gave them to a national-Premion-dedicated seller in NY/LA. Further, the campaigns that were sold, did not produce any results for clients and they would cancel.   TEGNA engaged in a misleading effort to shift the reason for below-goal digital/Premion sales from its unsatisfactory Premion products to Tilford, a proven salesperson.

(iii)   TEGNA's Position Statement again provided false information to the EEOC and twisted Tilford's words.  TEGNA's position statement told the EEOC falsely, "In fact, in August of 2023, [Tilford] stated to her manager Jordan Hutchison, that she was not interested in selling digital/Premion because the commission rate was not high enough."   What Tilford truthfully said is that the commission rate for Premion is really low.   Tilford's manager (Hutchison) replied that the commission rate has to be low because the profit margins are very small for TEGNA.  Tilford then said that she wanted to do what is best for her client, that she is a client-focused seller, and that Premion has not been producing the results they expected. Salespeople are motivated by money. Tilford suggested that TEGNA increase the commission rate for Premion.  Tilford never said that she does not sell Premion because the commission rate is not high enough let alone that she refused to "fully embrace digital sales."  She merely suggested that TEGNA pay more commission points on digital sales (and 4 months later this is what TEGNA did -- TEGNA greatly increased the commission percent paid for Premion sales starting January 2024).

(iv)   TEGNA attempted to mislead the EEOC about the pivotal role played by Gio Savorgnan, WFAA's Director of Sales, in attempting to hasten and cover up Tilford's termination with a Performance Improvement Plan ("PIP").  TEGNA's efforts in its Position Statement to leave Savorgnan out of the termination picture is not innocent (it is mendacious).  TEGNA was well aware of Tilford's allegations of continuing animosity toward her by Savorgnan following her

protected activity and took the trouble to lie about Savorgnan's record with respect to age bias. TEGNA's Position Statement mentions only Tilford's "new manager Craig Whitman" and a concurrence from her former manager Jordan Hutchison." TEGNA's Position Statement does not mention this clear evidence of the set up Tilford alleges as to the PIP and that Savorgnan endorsed and approved the PIP and expected Tilford to "fail" and to be fired: Tilford swore in the attachment to her EEOC charge that at a weekly manager meeting with Whitman:

> . . . Savorgnan was sitting in the room when I arrived, this was unusual for her to ever be present in a weekly manager meeting. There was no HR representation in the room.
>
> **Savorgnan said to me, "I want to talk to you about your PIP status. Let's be real, you aren't going to make it."**
>
> As of this date, there had only been 36 selling days (excluding Saturday/Sundays, 5/3 PTO & 5/27 Memorial Day).
>
> First PIP meeting on Friday 4/12. PIP document signed on Wednesday 4/17. PIP end date on Sunday 6/30.

(v)     TEGNA ended its "Factual Background" in its Position Statement with this sentence: "At the conclusion of the PIP, Complainant did not successfully complete the requirements of the PIP and was, therefore, terminated on July 2, 2024." Besides the erroneous statement that the termination was on July 2, 2024 (it was on July 1), TEGNA's statement continues its efforts to misstate and mislead the EEOC. The statement is misleading because the "therefore" part is wrong. The termination was because of Tilford's age (significantly older than 75% of the WFAA sellers), decided upon (TEGNA admits Savorgnan agreed to fire Tilford) by an age-biased boss who refused to hire older workers and who was antagonistic to Tilford continuously following knowledge of her protected activity. And the statement is misleading because it evades Tilford's allegation and evidence that the PIP was a setup, not a legitimate effort to address her Premion/digital performance, let alone her overall performance.

**IN 2024, TEGNA PRESSURED TILFORD AND USED UPCOMING LAYOFFS AND A FLURRY OF NEW HIRES OF YOUNG SALES EMPLOYEES AS A WAY TO GET RID OF TILFORD BECAUSE OF TILFORD'S PROTECTED ACTIVITY AND AS A WAY TO FURTHER ITS AGE DISCRIMINATION AGENDA**

31.    In January and February 2024, TEGNA made overt efforts to get rid of Tilford, either by forcing her to resign (Plan A) or by papering her file enough to feel comfortable that it could terminate her and avoid liability for unlawful termination (Plan B).  TEGNA was trying to interact with Tilford in a way that might convince Tilford, and any lawyer Tilford might look to for assistance, that any claim of discrimination or retaliation against TEGNA would be hopeless if TEGNA fired her.  TEGNA was trying to take actions against Tilford that would allow TEGNA to defeat any legal claim Tilford might take to court if TEGNA fired Tilford.

32.    In January 2024, Savorgnan was instrumental in denying a client request for Tilford to be the TEGNA rep for the Diaz Ad Group.  Savorgnan's took this unfavorable action against Tilford to further her plan to force Tilford to resign (Plan A) or to justify terminating Tilford based on a bogus claim of poor performance (Plan B) when Savorgnan's motive to get rid of Tilford was illegal retaliation and age discrimination.

33.    In March 2024 TEGNA "papered" Tilford's file – in furtherance of its plan to pressure Tilford to resign or to fire her for pretextual reasons because of her protected activity and because she was "too old."  "Too old" was the term Savorgnan applied to older people she did not want to have working at TEGNA.   On March 5, 2024, Natalie Stanford ("Stanford") who was with HR for TEGNA surprised Tilford with an accusation that Tilford was "colluding" with Razor Media, Tilford's husband's company.  HR falsely accused Tilford of not telling anyone that her husband was her client.   Stanford met with Tilford and falsely accused her of "double dipping on payout."  Sanford told Tilford falsely, "Well the mistake is that you did not tell anyone that your husband was your client."  The conversation was very uncomfortable for Tilford.  TEGNA was

attacking Tilford as part of TEGNA/Savorgnan's Plan A, its plan to pressure Tilford to resign in retaliation for her protected activities and due to age discrimination. As part of this pretextual "papering" projected, TEGNA gave favorable treatment to a much younger seller who was also on Whitman's team, Danielle Schofield, who worked with her mother and both gained financially. Tilford opposed age discrimination by asking about a double standard favoring the younger sales employe, Schofield. Tilford told Stanford and Whitman:

> Well, Danielle [a younger seller on Whitman's team] works with her mom, Carla Shoope, who has been a media buyer at several agencies and she is currently the media director at R2 and has booked millions and millions of dollars, with Danielle as her rep, for the last 12 years. They both have gained financially. Carla also benefits from all the WFAA concert and sports tickets that Danielle gives to her.

Stanford replied that she was surprised to hear this and would do "some investigation." Whitman asserted, "Danielle's situation is different," but he could not explain to Tilford why it was different. On information and belief, Stanford did not do an investigation about this double standard. Stanford did not report the results of any investigation to Tilford. The attack on Tilford on March 5, 2024 was part of the effort by TEGNA/Savorgnan to pressure Tilford to resign in retaliation for her protected activities and because of age discrimination.

34.    On March 11, 2024, the "paper the file" project continued. Stanford (HR) and Whitman met with Tilford and handed Tilford a letter that said, "Final Written Warning." But there had been no previous written warning. This put pressure on Tilford, who realized TEGNA was "papering" her file by trying to manufacture a "legitimate" reason to fire her in retaliation against her for her protected activities and because of her age.

35.    On March 12, 2024, TEGNA had companywide layoffs for the sales department. In the layoff, WFAA lost three sales support employees, but no salespeople.

36.     On March 31, 2024, Tilford met (at Tilford's request) with Stanford.  Tilford was worried about the "final warning" Stanford and Whitman handed her on March 11.  Tilford explained in more detail what her husband's company was all about.  Tilford wanted to reaffirm that her husband never takes money from any of his distributors, that is not the model in which his company is built, and let HR know that her husband could provide documentation and testimonies from owners of other companies he does business with if TEGNA needed proof that there was never an exchange of money for advertising -- this could be proven.  Tilford told Stanford that her husband and she are very ethical people and signing the document that Whitman wrote would have asked her to admit to false accusations.  Tilford told Stanford that she could not sign it.  Stanford replied that she understood, and she told Tilford that she agreed. Stanford said it would be okay if Tilford wanted to write a letter of explanation, and she would attach it to the unsigned letter and just "file it away."

37.     On March 26, 2024, TEGNA took another step to accomplish either "Plan A" or "Plan B."  Whitman and Hutchinson met with Tilford for her 2023 performance review.  TEGNA manipulated Tilford's 2023 performance review and provided Tilford a "Final Score" of "Change needed" to further Plan A and/or Plan B.  TEGNA also used the March 26, 2024 meeting to further Plan A and/or Plan B.  Whitman and Hutchinson made several false accusations and ridiculed Tilford's once celebrated, positive attributes as a salesperson, as negatives.  At the meeting, Whitman and Hutchinson gave Tilford a strong signal that TEGNA was laying the groundwork to fire her – they told Tilford that because of her poor Premion performance over the last 4 years, she would need to be put on a Performance Improvement Plan (a "PIP"). The PIP would not be for the broadcast TV portion of Tilford's business. Hutchinson stated "that is the part where you perform well and even exceed budgets. The PIP would be just for the Premion side of business."

38.     On April 12, 2024, TEGNA took another step to accomplish either "Plan A" or set up "Plan B."  Stanford (TEGNA HR) and Whitman met with Tilford in a meeting that started at about 11:30 AM.   Stanford and Whitman and told her that the meeting was to discuss a PIP due to Tilford's lack of performance with Premion since 2020.   In an effort to accomplish Plan A (the plan to pressure Tilford to resign), Stanford told Tilford at the meeting, "We do have another option for you, if you are so inclined."  Stanford told Tilford to. Go home and think about a "second option" if she did not want to "put in the time, the work, the energy" to try to succeed at the PIP.  Stanford indicated to Tilford that if she was not inclined to try to succeed at the PIP, "I wanted to makean offer to ou to say that we would be willing to give you a package of sorts . . . that would allow you to no longer be here." Stanford said, "I wanted to start and open the door at eight weeks of, of severance pay."  Stanford continued, stating,

> [W]e typically don't pay for poor performance. We don't pay people to go away because they're performing, um, not up to expectations. But I feel as though this is a unique situation. It might be something that you're interested in, and I wanted to offer it to you. No pressure. Totally up to you. You can come back and say, "Nope. I'm committed to the PIP. Let's do this," and it's off the table.

Stanford continued, "I don't know what your timing was like. I wanna get you otta here if you want, if you need to."  Stanford added, "eight weeks of pay is $27,388 and 72 cents."

39.     Tilford was stunned and worried.  She managed to say: "Here's my thing is, I'm – I have such a love for WFAA."  She added, "I hadn't even thought in that direction." This was a very painful light bulb moment for Tilford. Finally, it all made sense as to why management had been making her job so miserable and stressful.  Tilford realized that TEGNA was trying to push her out, hoping she would leave on her own so that TEGNA would not be exposed to a legal claim for firing Tilford in retaliation for her protected activity and because of her age.  At the April 12, 2024 meeting, after the "light bulb" moment, Tilford struggled to survive.  Tilford did not want to

resign.  Tilford did not want to be fired.  Tilford wanted to keep her TEGNA job.  She needed the job and she was good at it.  Her "mistakes" were to have opposed illegal discrimination, which infuriated Savorgnan and made Tilford a "marked" person, and to grow older, becoming "old" and undesirable to TEGNA/Savorgnan.  Tilford did not sign the PIP at the meeting.  Tilford told Stanford and Whitman she would need some time to review it.

40.    Tilford signed and returned the PIP document to Whitman.  It was apparent to Tilford that Whitman was "in on" Savorgnan's plan to get rid of her.  Whitman was awkwardly energetic when Tilford handed the signed PIP to Whitman. Whitman signed the PIP and took it to Savorgnan to sign and emailed HR a copy.  Tilford made it clear to Whitman that she wanted to keep her job and would work hard even though under the PIP that set her up to fail.  The PIP only allowed Tilford 2 months to prospect, pitch, close, book and complete the Premion campaigns by June 30th to get credit for the PIP goal TEGNA had in place. The pressure from TEGNA on Tilford to resign caused Tilford tremendous stress and anxiety, particularly as she thought about how May would mark her 12th Anniversary at WFAA.  Tilford was walking on eggshells not knowing what TEGNA would claim she did wrong next.   TEGNA's pressure to resign, paper-the-file, and PIP tactics caused Tilford extreme hair loss, and waves of chest pain, teeth grinding, irritability, fear, and exhaustion.

**AS TEGNA PRESSURED TILFORD TO RESIGN AND SET HER UP
FOR TERMINATION, TEGNA FAVORED YOUNG
SALESPEOPLE AND HIRED MORE OF THEM**

41.    In 2023, Savorgnan began inviting the SDR team (sales development reps) to all WFAA team events. WFAA staff was confused as to why Savorgnan invited these young SDR sellers to all the celebrations that were for WFAA sellers, but looking back, Tilford realized this was because Savorgnan and TEGNA favor young employees.

42.    On April 25, 2024, Tilford attended a meeting where Zach Jaffe ("Jaffe"), a young salesperson at WFAA, a TEGNA Sales Development Representative, exclaimed, "Can you believe it, TEGNA has just hired 7 new SDR [Sales Division Representatives] kids and they all start June 3, 2024."

43.    During the 79-day period of her PIP, Tilford did everything she could to "succeed." Tilford worked hard and well trying to achieve the PIP requirement, but the PIP was intentionally unrealistic.   Tilford did all required of her except achieve the undoable numbers Savorgnan had imposed.    Savorgnan knew she gave Tilford "mission impossible."

44.    Savorgnan came to Tilford on June 5, 2024, before the end date on the PIP and told Tilford, "I want to talk to you about your PIP status.  Let's be real you aren't going to make it." Savorgnan did this as part of Plan A – to pressure Tilford to resign so Tilford could not possibly bring a claim for retaliation or age discrimination.  As of this June 5, 2024, when Savorgnan told Tilford she was not "going to make it," there had only been 36 selling days (excluding Saturday/Sundays, 5/3 paid time off ("PTO") days and Memorial Day).

45.    On June 14, 2024, WFAA had a sales team outing, organized by Savorgnan as a Q1 2024 incentive trip.  Tilford was sick with flu/pneumonia and unable to attend.

46.    On June 18, 2024, another WFAA sales manager, Gigi Tregoning ("Tregoning") told Tilford how fun the long bus ride was to Choctaw Casino. Tregoning said, "there was a lot of alcohol, 500 cans of white claws and 300 beers, in the coolers on the bus and there were a lot of drunk people." Tregoning showed Tilford several videos that were taken on the bus of people acting out of control, drunk, and dancing. The bus included most of the WFAA sales team, some national sellers, and the SDR (sales development reps), the youth movement -- 7 young employees

that TEGNA hired in June 2024 to generate new business for TEGNA stations. Mattie Smith (Savorgnan's 24-year-old daughter) was also on the bus.

47.    Later on June 18, 2024, Savorgnan ganged up on Tilford.    Pushing Plan A (TEGNA's plan to pressure Tilford to resign -- a "safe" way to get rid of Tilford), Savorgnan met with Tilford along with Stanford (HR) and Whitman.    At the meeting Savorgnan relentlessly pressured Tilford to give up – to realize that she would fail to accomplish the PIP goals and be fired unless she was realistic and resigned in return for a small amount of money, but in a way that cost Tilford her right to complain of being fired illegally.    At the meeting, Savorgnan, Stanford and Whitman were all rushed, frustrated, eager to get an exit plan for Tilford in motion, claiming to be confused as to why they were having a meeting if Tilford did not show up with an "exit plan" and irritated that Tilford had so many questions and did not just go quickly and quietly. The meeting started with some small talk.    Here is what happened after that at Savorgnan's June 18, 2024 meeting:

A.    Stanford said: "Ok, let's talk about why we're all here.  Nicole, I will let you start the meeting."

B.    Tilford said,

Thank you everyone for your time, I do have some questions, but first off just want to say that when I was hired at WFAA 12 years ago I made a commitment to make this my lifelong career, I have given 100% of myself, blood, sweat, and tears. I have had more time to really think more about all of this and I don't understand why you would want to get rid of a seller that has been as dedicated as me and I basically just want to ask Gio [Savorgnan] if she is sticking with the decision to fire me?

C.    Savorgnan said, "Ummm."  Savorgnan then looked to Stanford at the other end of the table.  Stanford did not know how to answer -- like a child sitting in time out who had been told not to speak.  Savorgnan never answered Tilford's question.

D.    Stanford then said, "I think what Gio is trying to say is that you actually control the narrative here."

E.    Tilford said: "Well Gio made several comments in our last meeting on June 5th about me being fired.

F.    Stanford, playing dumb, said: "Why do you keep asking this?"

G.    Tilford replied, "Because Gio made several comments about me being fired in our last meeting.  That is hard for me to hear, I have never been "fired" from a job in my 29 years of employment, and it hurts to hear it."

H.    Whitman jumped in and started talking immediately, which was out of character for him when Savorgnan is also present in the meeting. Whitman started recapping the past and how they got to this point and said that Tilford did not execute properly on the PIP plan.  This was false.  In fact, Tilford had done everything that was asked of her each week, but fell short of the unreasonable PIP goal. Two large orders were canceled/moved out of Q2 and would not have run by end of June, so they would not count. Tilford added 4 new Premion clients to Q2. Management never praised these wins.

I.    Tilford said, "So Gio, I would like to hear from you, you haven't said anything."

J.    Savorgnan finally spoke.  Savorgnan said, "Well…I apologize if I said that. I did say that I was fired, I was talking about myself."

K.    Tilford asked Savorgnan, "Then why Gio -- why would you say, 'Hey listen, I was fired in the past and look at me now!' if you weren't making a connection between my current situation and what happened to you in the past?"

L.    Savorgnan did not speak.  She just had a blank facial expression as if she had no idea how to respond to the facts.

M.      Tilford, looking directly at Savorgnan, asked, "Can I ask who made the decision to fire me?"

N.      Savorgnan replied, "All of us."

O.      Tilford followed up, asking Savorgnan, "Who is all of us?"

P.      Savorgnan, conscious of guilt, asked Tilford, "Why are you asking?"

Q.      Tilford pursued, stating, "I'm just curious, Gio was it you? Was it HR? Was it Brad Ramsey?"

R.      Savorgnan replied, "It was Jordan (Tilford's past sales manager from 2022 and 2023), Craig (Tilford's current manager), Natalie (HR), and myself. All 4 of us."

S.      Stanford jumped into the conversation, stating "We have spent a lot of time on details when creating your PIP."

T.      Tilford asked, "Why now are you putting me on a PIP now?"

U.      Stanford answered: "You have been underperforming with Premion for the last 4 years and it had to stop. Jordan had been pushing you to sell it last year and you said 'you don't sell it because you don't get paid much on it.'"

V.      Nicole replied, "I want to correct you with that statement. That comment was taken out of context. What I said to Jordan is that salespeople are motivated by money and if you want them to sell more of a product, then pay them a higher commission on it. The Premion commission percentage should be increased from 3% to 9%." (This would have been the same percentage that is paid for Enterprise/New broadcast TV business). Tilford added,

> This PIP was not designed for me to succeed, it was only 2 ½ months, I feel like it is illegal, only 36 sales days to date when Gio came to me on 6/5 and asked me what my exit plan was. She had already decided that I was not going to achieve the goal, when I had 19 more days of the PIP to go. Also, I am not getting any credit for the $36,000 that I did sell in 2Q, of that $30,000 moved from June to November (out of my control), the other $6,000 the June campaign was set up incorrectly by

the digital executive [Tyler Tregoning], also the client is not seeing any results in 2 months after using Premion. These are things out of my control. Gio, what if I booked $40,000 of Premion to run right now for June and I met your PIP goal, would you be happy for me?

W.    Savorgnan replied, "Well, that is not going to happen"

X.    Whitman added, "Well that's just the nature of the business, cancels happen."

Y.    Tilford said:

Yes, Craig, but I am being fired over these 2 clients moving out of 2nd quarter? How is that fair? Or setting me up to succeed? Your PIP says that I must find Premion business, sell, book it, and run it all by 6/30 in this current market where we all know is slow to commit and fast to cancel…slow as a sloth as Gio discussed with the salespeople in our sales meeting a few weeks ago. Why am I not getting credit for the business I did book, even though it moved out of 2Q?

Z.    Stanford stated:

That wasn't the terms of the PIP, you are trying to renegotiate the PIP, and we aren't going to do that. We spent a lot of time crafting the PIP for you so that it would be fair. A PIP is not 3 months, most of them are 60 days, and we are not required to even offer PIPs to employees. Ok so what do you want to do here? You control the narrative. Are you concerned about the money? I know you mentioned that your salary is important in your household.

AA.    Tilford said,

Yes, I am responsible for one half of all bills, my son's school, and I am concerned because I am 50 years old now, I am not like these kids that we just hired right out of college.  Gio like you have said in sales meetings, the kids these days are super savvy with computer skills and advanced technology.

BB.    Savorgnan replied, "Oh yes! No denying that!"  Savorgnan consistently in sales meetings over the last 2 years, had talked about her daughter, Mattie, and how good she is at selling and how she gets clients appointments so easily just by just sending emails and using Seamless AI, LinkedIn and social media.

CC.     Stanford very much aware of Tilford's age, added: "Look at me, I'm 50, and I am moving to a different company, I got a job." (Stanford's last day with TEGNA was June 21, 2024.)

DD.     Whitman, also fully aware that Tilford was getting "old," added: "Yeah, and I'm 55 and have more skills than any 25-year-old, I would go up against anyone younger that thinks they are better at my job."

EE.     Stanford pushed the Plan A agenda (to pressure Tilford to leave TEGNA "voluntarily). Stanford asked Tilford, "Have you even started looking for another job to see what is out there?"

FF.     Tilford replied, "No, I haven't, I have no idea what to do, I would have to get out of TV, as we know this platform is changing." Tilford looked directly at Savorgnan and asked, "Gio, does this have anything to do with the EEOC charge I filed in the past?" After a long pause indicating her guilt, Savorgnan mumbled "um, no."

GG.     Tilford started crying and said, "Gio, I have felt a dark cloud over me since that time and I know you don't like me."

HH.     Savorgnan stated, "I had nothing to do with that." Savorgnan did not respond to Tilford's "you don't like me" statement, which hurt Tilford more.

II.     Tilford contradicted Savorgan, stating: "Yes, actually you did. Jenn Temple was my manager, and you were Jenn Temple's manager."

JJ.     Savorgnan replied with TEGNA's pre-planned pretext: "Well, no this is separate. The TV world has changed and Premion is now the focus, and you continue to be at the bottom of the numbers for Premion."

KK.    Tilford shot this down, stating, "This is not true Gio, I know of 3 sellers that are always below me on the ranker that is posted in the sales pit. We only have 6 out of 13 sellers that are at 85% of Premion for Q2 and the quarter ends in 2 weeks."

LL.    Savorgnan replied dishonestly: "No, you are always last." This was a false statement by Savorgnan, designed to help force Tilford to give up and leave WFAA and sign away her legal rights.

MM.    Stanford gave up on the pretext and tried to sell Plan A to Tilford.  Stanford said: "Nicole, once again, what is it that you need to leave on a good note? Why don't you do some reverse math, think about what your average monthly income is, and just ask for help, maybe we can get you 4 to 6 weeks of pay to help give you time to focus on the next chapter in your life. Like a transition package. Also, you could also file for unemployment."

NN.    Tilford asked: "Is unemployment only offered if you are fired?"

OO.    Stanford responded, "I'm not sure."

PP.    Whitman added his pitch to convince Tilford to leave TEGNA "voluntarily," acting nice, by saying,

> Nicole, I have known you for 12 years and you are the best at client relationships and your clients love you. You are so positive, you always have a smile on your face, you light up the room when you enter it. You will be amazing at anything you do. You see the glass as overflowing, when I see the glass, its half empty all the time, I admire you for your positivity!

QQ.    Nicole responded: "Thank you, Craig, for saying such nice things to me."  Tilford was emotional and crying.  Tilford went on, saying, "I just can't believe this is happening, I really thought you would all fight to keep me here." Realizing the bully-Nicole-into-resigning efforts were not going well, Whitman exited the room.

RR.     Stanford, appearing frustrated, told Tilford, "Well okay then, what do you want to do, just wait out until the end of the PIP on June 30th, is that really what you want to do? Then okay."

SS.     Tilford asked: "What day does June 30th fall on? A Friday?"

TT.     Stanford looked at a calendar and said, "June 30th is actually a Sunday."

UU.     Tilford asked: "So, it would be Friday, June 28th instead?"

VV.     Stanford replied: "Yes, June 30th, well I can actually give you until Monday July 1st if you want. I need to leave for another meeting now."  Stanford left the room.  Now only Savorgnan and Tilford were present in the room.

WW.    Savorgnan, who continued efforts to pressure Tilford into giving up her job "voluntarily," said to Tilford, "I know this is hard. I have been fired actually two times in my career. One time in my 20's and then another time in my 40's, I was in over my head and underqualified. My husband's sister has a daughter that works for a drug company that is moving to Dallas, if you want me to make a call for you I can."

XX.     Tilford asked, "What kind of drug company?"

YY.     Savorgnan answered, "They have a bipolar drug, brand new to Dallas market, so let me know if you want me make that call. Listen I want you to really figure out what you want so we can have Natalie [Natalie Stanford – HR] help us push it through." Then Savorgnan changed her answer to Tilford's question in the beginning of the meeting about "Whose decision, was it?" Savorgnan's original answer earlier in the June 18, 2024 meeting was "All of us." But with just Savorgnan and Tilford in the room Savorgnan changed her answer.  Savorgnan stated,

> When it comes to the PIP, I make the decision.  All me. But when it comes to a transition package, that has to be approved by Natalie in HR and then Brad Ramsey (WFAA GM) has to sign off on it. That I do not have the power to do. So, what does a package look like for you? 2 to 3 weeks? Just ask. I just can't stress this

enough, we need to try to get something done this week, Natalie is gone after Friday, 6/21 and unless you want to take the risk with whoever is going to replace her.

Savorgnan exited the room.

48.    Later on June 18, 2024, after the "gang up on Tilford" meeting, Tilford's manager, Whitman, made it plain to Tilford that TEGNA planned for sure to fire her.  Whitman cancelled Tilford's weekly 1:1 (sales AE/Manager) meetings from the outlook calendar. These meetings were every Wednesday from 2:30-3:30 pm. Tilford knew that Whitman was a stickler about the calendar, so the fact that he canceled all recurring manager meetings with him for the rest of the year signaled that she should just go ahead and resign or that she was certainly going to be fired for "failing" the PIP as TEGNA planned.

49.    On June 21, 2024, a Friday, Savorgnan/TEGNA kept pursuing the Plan A or Plan B approach to get rid of Tilford.  At **11:01 am** Savorgnan called Tilford's cell phone and leaves a voicemail saying she is just "touching base" with Tilford.  **12:10 pm**-Whitman sent Tilford a text that said, "Hi Nicole, Gio said she called you. Please return her call. Thanks!" Tilford sent Whitman a text response, "Yes I will, on the phone with a client."  At **12:31 pm** Tilford sent a text to Savorgnan that said,

> Hi Gio, you left me a voicemail earlier and I'll give you a call back in just a few minutes. I am sending you this text because I want to be sure you understand my position. In our meeting this week on Tuesday, you indicated you wanted to get a transition plan in motion for me, you seemed confused as to why I didn't show up to the meeting with an exit plan. You seemed irritated that I was asking so many questions. I want to be clear; I have worked at WFAA for many years and dedicated my working career to the company. I do not want to exit. I do not want to be fired. I do not want to trade my good high paying job, for a small "package." It is my belief that what's going on is a plan by Tegna to fire me because of my age and because in the past I have complained about sex discrimination and retaliation. I am asking this company to please do not fire me. Please let me remain as an employee! I will do my best, as I always have, to be a high performer, I promise!!! Call you in just a second, wrapping up a call now.

50.     At 12:31 pm on June 21, 2024, Tilford read the text receipt by Savorgnan. At 2:16 pm Savorgnan responded with this text message,

Nicole, I was contacting you, as a courtesy, because you had questions on next steps. If you still have questions, please feel free to contact me. Lastly, I am surprised that you are suggesting the Company is engaging in discrimination and retaliation against you. To the contrary, WFAA's efforts to address your performance are based on legitimate non-discriminatory reasons. To that end, your PIP is still pending, and we will continue to manage it accordingly. Gio

51.     On June 26, 2024, Tilford attended a meeting of WFAA's entire sales staff.  Still pushing Plan A to get rid of Tilford, Savorgnan presented information that disclosed to Tilford that her hopes of reaching her PIP goals were in vain and that the PIP goals Savorgnan/TEGNA had imposed on Tilford were designed to make Tilford fail.  Savorgnan addressed the current station revenue numbers and said, "WFAA is only at 77% of Q2 budget for Premion/digital with one week to go and clearly we are not going to make it, which is disappointing." The PIP given to Tilford was based solely on Premion revenue for Q2 but the station as a whole, with all seller's revenue combined, had only achieved 77% to goal.

52.     Also on June 26, with her Plan A time running out, Tilford went to a manager's meeting with Whitman.  In an unusual move, Savorgnan attended the meeting.  Tilford had a tough time breathing.  She felt ill.  Neither Whitman nor Savorgnan mentioned anything about a PIP, acting like everything was "business as usual" for everyone.

53.     From June 27 until July 1, 2024, Tilford received no communications from Savorgnan.  Tilford continued to do her best to meet the goals of the PIP that TEGNA gave her on April 4, 2024.  The goals were unrealistic and doomed Tilford to "fail."  TEGNA knew that. TEGNA planned to fire Tilford at the end of the 2.5 months but hoped it could force Tilford to resign and sign away her rights to complain of illegal retaliation and age discrimination.

**UNLAWFUL TERMINATION**

54.     At 8:45 am on July 1, 2024, Savorgnan sent Tilford a calendar invitation to schedule a zoom meeting for 9:15 am.  Tilford was at a doctor's appointment and asked to move the meeting. At 10 am, Savorgnan and Emily Chamber (Group HR Director- SE Region based in Atlanta, GA) joined the call.  Savorgnan: "Well I want to introduce you to Emily; she is joining us because Natalie [HR] left us recently. Emily oversees HR for all of Texas." Savorgnan said: "So, this is not easy, but as you know, your PIP has ended and unfortunately you did not successfully complete it, so I have made the decision to terminate you effective immediately."

**TILFORD PERFORMED WELL AT TEGNA**

55.     Despite the plan of TEGNA/Savorgnan to build a pretext for firing Tilford in retaliation for her protected activity and because of her age, Tilford maintained a record of good performance (not poor performance) at TEGNA.

56.     Tilford was very successful with TEGNA from the time she was hired in 2012 until sometime after Tilford got a new manager near the end of 2017, Jennifer Temple ("Temple"). Tilford was young (age 38) when she started at TEGNA, but she kept growing older, and that advancing age, plus TEGNA's anger at Tilford's protected activity, eventually put an end to her WFAA career.  When Tilford joined the WFAA team on May 16, 2012, she committed to a lifetime career at WFAA. Tilford have embodied the spirit and culture of WFAA and had the highest respect for the station and its role in the community. For Tilford, selling WFAA's products was a deeply rewarding experience, and she was proud of the work she and WFAA accomplished together. Tilford invested her professional reputation and delivered invaluable goal performances earning the name "Enterprise Queen" amongst her peers and management. During her years of

loyal service for TEGNA, Tilford earned many awards and honors. These are examples of some of Tilford's accomplishments:

- Key Client Acquisition: Secured and managed solid relationships with high-profile clients, resulting in long-term contracts worth a combined average of more than $4 million annually.

- Enterprise Business Development: Consistently generated over $1 million in new "Enterprise Business" every year from 2016 - 2021. Billed over $1 million of new business in 2016, the year Tilford was pregnant and took full maternity leave. This was unprecedented in the history of WFAA. In 2022 - 2023, Tilford established 32 new clients which generated over $1.7 million in new business revenue for WFAA.

- WFAA Presidential Top Sales Award Winner in the year 2013, 2017, and 2018.

- TEGNA's $1 Million+ Enterprise Club 2021 Award Winner; 1 of 10 sellers in the company across all U.S. TEGNA stations to receive this prestigious recognition.

- TEGNA's 10 Years of Service Award in 2022.

- Human Equity Group Committee: Volunteered to serve as a member of the Human Equity Group at WFAA to help improve diversity and inclusion initiatives with employees across all departments within the station, 2022 - 2023.

- Successfully led the execution of the annual holiday gift initiative, including concept development, product selection, purchasing, packaging, creative card designs, and distribution for the entire sales team from 2017- 2023.

- Winner of the ComScore TV Sales Case Study Contest, using ComScore rationale helped Tilford secure a new client for WFAA and resulted in a very successful campaign for the client. Tilford's success story won an all-expense paid trip to Laguna Beach, California where she was honored to be highlighted as a guest speaker at the ComScore conference

**TILFORD FILES EEOC CHARGES AND RECEIVES A RIGHT TO SUE LETTER**

57.    On September 27, 2024, Tilford filed charges of age discrimination and retaliation against TEGNA with the United States Equal Employment Opportunity Commission and the Texas Workforce Commission on Civil Rights.   In addition to the EEOC charges themselves,

Tilford filed Attachment A, 22-page, single-spaced description of her claims, including this Discrimination Statement:

> I believe I have been discriminated against by TEGNA because of my age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. (the ADEA) and the Texas Commission on Human Rights Act, TEX. LABOR CODE, § 21.001 *et seq.* I believe I have been retaliated against by TEGNA because of my protected activities in violation of the ADEA, Title VII or the Civil Rights Act of 1964, as amended, and the Texas Commission on Human Rights Act, TEX. LABOR CODE, § 21.001 *et seq.*

The EEOC issued notice of right to sue letters on April 7, 2025. Tilford is filing this suit within 90 days of her receipt of the notices. Tilford has exhausted all the necessary administrative prerequisites for this lawsuit under Title VII and the ADEA. There is no valid and/or enforceable arbitration agreement between TEGNA and Tilford covering the subject matter of any of her claims in this action.

**FURTHER RETALIATION BY TEGNA AGAINST TILFORD**

58.     After TEGNA terminated Tilford on July 1, 2024, Tilford filed her EEOC Charges on September 27, 2024. On April 1, 2025, Tilford learned on LinkedIn that TEGNA/WFAA was advertising to hire an Account Executive at WFAA-TV Dallas. TEGNA's job posting described the vacancy as one that matched Tilford's qualifications and background. TEGNA responded as follows:

> Thanks for applying to our Account Executive opening. We appreciate the time you took to complete the application process and confirm that we have received it and we are in the process of reviewing it.

> If your skills and experience are a fit for the role, a Recruiter or Hiring Manager will contact you. If your listed experience and skills aren't a fit for the role, we will also notify you, and we will also keep your resume in our talent database for future openings that may be a better match.

> Feel free to keep any eye on our Careers page for any new jobs that may be a fit for you along with learning more about our culture and people: <u>TEGNA Careers</u>.

Kind regards,

The TEGNA Talent Acquisition Team

TEGNA added to its response: "Please note:  Do not reply to this email.  This email is sent from an unattended mailbox.  Replies will not be read."  Despite the fact that Tilford's skills and experience fit the role, TEGNA failed and refused to have a Recruiter or Hiring Manager contact Tilford and failed and refused to consider Tilford and to hire her for the vacant position.  TEGNA's failure to consider and hire Tilford for this Account Executive opening was further age discrimination and unlawful retaliation against Tilford because her protected activity.  Tilford has satisfied all jurisdictional prerequisites for bring this claim for further retaliation.  See *Gupta v. East Texas State University*, 654 F.2d 411 (5th Cir. 1981).

## CAUSES OF ACTION

A.    **COUNT ONE:  RETALIATION**

59.    Tilford incorporates by reference Paragraphs 1 through 58.

60.    TEGNA's acts and omissions, including but not limited to TEGNA's termination of Tilford on July 1, 2024, and TEGNA's subsequent failure to consider Tilford for hire and TEGNA's failure to hire Tilford were because of Plaintiff's protected activity.  These acts and omissions constitute a willful, continuing violation of the Title VII and the ADEA.

61.    Due to Defendants' wrongful and illegal acts and omissions Tilford has suffered, and continues to suffer, reputational damage, mental anguish damages, and other damages including but not limited to lost wages and compensation, both past and future, and the value of fringe benefits, both past and future.

62.    Defendants' unlawful acts and omissions referenced in paragraphs 1 through 58 were willful and malicious, thereby entitling Plaintiff to liquidated damages and punitive damages.

63.     Defendants' unlawful acts and omissions referenced above in paragraphs 1 through 58 have caused Plaintiff to retain the services of the undersigned counsel to pursue her federal rights in this action.  Plaintiff seeks her reasonable attorneys' fees, expert fees, and costs in this matter.   Plaintiff is entitled to attorneys' fees and costs of suit under 42 U.S.C. §§ 12101, *et seq.* and 42 U.S.C. §§ 1988.

**B.     COUNT TWO:  AGE DISCRIMINATION**

64.     Tilford incorporates by reference paragraphs 1 through 63.

65.     TEGNA's acts and omissions, including but not limited to its termination of Tilford on July 1, 2024 and TEGNA's subsequent failure to consider Tilford for hire and TEGNA's failure to hire Tilford were because of Plaintiff's age.  These acts and omissions constitute willful, continuing violations of the ADEA.

66.     Due to Defendants' wrongful and unlawful acts and omissions, Plaintiff has suffered, and continues to suffer, damages including but not limited to lost wages, compensation, and benefits, both past and future.

67.     Defendant's acts and omissions referenced in paragraphs 1 through 63 were willful, thereby entitling Plaintiff to liquidated damages under 29 U.S.C. § 626 (b).

68.     Defendant's acts and omissions referenced above in paragraphs 1 through 63 have caused Plaintiff to retain the services of the undersigned counsel to pursue her federal rights in this action.  Plaintiff seeks her reasonable attorneys' fees, expert witness fees, and costs in this matter. Plaintiff is entitled to attorneys' fees and costs of suit under 29 U.S.C. § 626 (b) and 42 U.S.C. §§ 1988.

**JURY DEMAND**

69.     Tilford requests a jury trial on all issues, claims, actions, and defenses in this case.

## **PRAYER FOR RELIEF**

WHEREFORE, Tilford prays that TEGNA be summoned to appear and answer, and that on final trial, judgment be granted against TEGNA giving Tilford:

a.      The following injunctive relief:

     (i)      Requiring TEGNA to take all actions necessary to reinstate Tilford to the position of Senior Account Executive of TEGNA at WFAA with the full benefits and compensation of such position and if reinstatement is feasible ordering injunctive relief that protects TILFORD from any retaliation for having engaged in protected activity and made her complaints herein.

     (ii)      Requiring TEGNA to provide training on the priority and importance of avoiding age discrimination and unlawful retaliation, with the training to be tailored to the problems, deficiencies, and gaps that the evidence shows;

     (iii)      Requiring TEGNA to periodically report in writing to the Court, with a copy to the EEOC and Plaintiff's counsel on the manner of compliance with the terms of any final order for non-monetary relief – with the reporting to be tailored to the evidence;

     (iv)      Requiring TEGNA to deliver a copy of any Court Order in this matter to the EEOC and to the CEO of TEGNA within fifteen days after the entry of such Order;

     (v)      Requiring TEGNA to provide all current employees of TEGNA a **NOTICE TO EMPLOYEES** that sets forth in full (i) this Complaint; (ii) any Court Order in this matter, and (iii) the full provisions of all federal laws TEGNA has been found to have violated, and

     (vi)      Requiring each of the officers and/or employees of TEGNA included by name in this Original Complaint, no later than two months from the date of the Court's Final Order in this matter to (1) attend and participate in good faith at the expense of TEGNA at least a one-week bona fide training program, offered by a qualified third-party training provider, as to United States laws prohibiting retaliation and/or age discrimination and (ii) file a certificate of compliance with this Court certifying successful completion by such officers and/or employees of TEGNA of the training, stating the dates of such training and the date of successful completion of such training, and providing the full name, address, and leadership/ownership identity of the third party training entity and the cost of such training;

b.      A declaration that TEGNA's actions complained of by Tilford violated the ADEA and Title VII, plus individually tailored injunctive relief to address and rectify TEGNA's unlawful acts and omissions;

c.      Back pay, including but not limited to, lost wages and employment benefits;

d.      Equitable relief necessary to place Tilford in the position that she would have held but for TEGNA's unlawful and/or wrongful acts and omissions; and, if such relief be not feasible, appropriate front pay;

e.      Injunctive relief necessary to permanently and forever enjoin TEGNA from discriminating and retaliating against Tilford and others who complain of unlawful discrimination by TEGNA;

f.      Actual and compensatory damages, including but not limited to reputational damages;

g.      Consequential and/or incidental damages;

h.      Liquidated damages under the ADEA and punitive damages under Title VII;

i.      Prejudgment and post-judgment interest;

j.      Attorney's fees, expert fees, and costs of suit;

k.      Such other and further legal and equitable relief to which Tilford may justly be entitled.

DATED:      July 1, 2025                    Respectfully submitted,

GILLESPIE SANFORD LLP
4803 Gaston Avenue
Dallas, Texas 75246
Tel.:    (214) 800-5111
Fax:    (214) 838-0001

By: */s/ Hal K. Gillespie*
        Hal K. Gillespie
        *Attorney-in-Charge*
        Texas Bar No. 07925500
        hkg@gillespiesanford.com
        Joseph H. Gillespie
        Texas Bar No. 24036636
        joe@gillespiesanford.com
        ATTORNEYS FOR NICOLE
        ELLEN TILFORD